AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

the iPhone Described in Attachment A-2

Case No. 3:26-mj-00295

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the Southern District of Ohio, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC 841(a)(1)/843(b)/846 | distribution of controlled substances/use of a communication facility/conspiracy |

The application is based on these facts:

See Attached Affidavit of Cameron D. Basile

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Cameron D. Basile
*Applicant's signature*

Cameron D. Basile, SA of the DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by reliable electronic means.

Date: 7/1/26

*Judge's signature*

City and state: Dayton, Ohio

Peter B. Silvain Jr., United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

# AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Cameron D. Basile, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices further described in Attachments A-1 and A-2, which are currently in law enforcement possession in the Southern District of Ohio, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), assigned to the Dayton, Ohio (OH) Resident Office. As such, I am an officer of the United States who is legally empowered to conduct criminal investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510. The information set forth in this affidavit is either personally known by me or has been relayed to me by other law enforcement officers who are actively involved in this, and other related investigations. In May 2023, I completed the DEA Basic Agent Training Academy in Quantico, Virginia. This 17-week course included instruction on various law enforcement topics to include: narcotics identification, surveillance techniques, narcotics trafficking methods of operation, evidence handling, undercover operations, and current trends/patterns involving the distribution of narcotics, as well as other areas of drug enforcement.

3. During my DEA career, I have participated in numerous investigations involving the distribution of controlled substances to include marijuana, cocaine, heroin, methamphetamine, fentanyl, metonitazene, and counterfeit pharmaceuticals. To date, I have also

assisted in the investigation of financial crimes to include money laundering, structuring of criminal proceeds, and bulk cash smuggling. I have interviewed numerous witnesses, subjects, and defendants who were involved in drug activity and have also participated in several joint interagency federal and state investigations. Additionally, I have participated in and supervised the use of confidential sources, conducted physical surveillance, affected both search and arrest warrants and authored numerous reports of investigation. I have also authored multiple affidavits filed in support of applications for search warrants for private residences, cellular telephone location pings, suspicious mail parcels, and GPS trackers. Based on my prior law enforcement training and experience, I have also become familiar with certain street slang terminology commonly used by drug traffickers which is intended to disguise their illegal activities and *modus operandi*. Based on my training and experience, and on-the-job discussions with other law enforcement agents and cooperating suspects, I have become familiar with the common and typical practices and activities of drug smugglers and traffickers.

4. The facts contained in this affidavit are based upon my prior law enforcement training and experience, my personal involvement in this investigation, along with information conveyed to me by other agents and witnesses knowledgeable of facts and circumstances of this matter. This affidavit is only intended to establish the existence of sufficient probable cause to justify the issuance of the requested search warrant. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is:

a. a white Apple iPhone with clear and purple case and no visible IMEI (herein referred to as "**Subject Device 1**"), which is further depicted and more fully described in Attachment A-1; and

b. a whitish pink Apple iPhone with clear and black case and no visible IMEI (herein referred to as "**Subject Device 2**"), which is further depicted and more fully described in Attachment A-2.

(collectively referred to as the "**Subject Devices**"). The **Subject Devices** were seized by law enforcement officials on June 23, 2026, during the execution of a court authorized North Carolina state search warrant at 7015 Skye Bridge Way, Apt 211, Charlotte, North Carolina 28278. On June 25, 2026, DEA agents transferred the **Subject Devices** to the Ohio Narcotics Intelligence Center (ONIC) located at 50 E. Business Way, Cincinnati, OH 45241 to be securely stored in preparation for data preservation and forensic analysis upon authorization of search warrants for them.

6. I submit that probable cause exists to believe that evidence of one or more of the below listed crimes, will be found in the stored electronic data contained in the **Subject Devices**, to wit:

a. Possession with Intent to Distribute Controlled Substances, in violation of Title 21 U.S.C. § 841;

b. Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21 U.S.C. § 846;

c. Use of a Communication Facility to Commit a Felony, in violation of Title 21 U.S.C. § 843(b).

7. The applied-for warrants would authorize the forensic examination of the **Subject Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### A. General Information on Tyisha SEKE

8. As detailed below, the DEA has investigated Tyisha SEKE, also known as "Esha" or "Eesha" (hereinafter "SEKE") for her role in a multi-state drug conspiracy that involved, among things, the distribution of kilograms of cocaine from southern California to the eastern United States, including Ohio and North Carolina.

9. As a result of this investigation, which is described more fully below, a federal grand jury in the Southern District of Ohio indicted SEKE on or about October 28, 2025, for, among other things, conspiring to distribute and possess with intent to distribute over 5 kilograms of cocaine, a Schedule II controlled substance. Based on the indictment, the United States District Court for the Southern District of Oho issued an arrest warrant for SEKE on or about that same day.

10. During early May 2026, DEA queried law enforcement databases to determine SEKE's current residence and whereabouts. Those searches produced multiple results, including several addresses in North Carolina and Georgia.

11. On May 28, 2026, this court authorized a federal search warrant[1] for GPS and historical location data pertaining to the **Subject Devices.** The search warrant was subsequently served to Verizon Wireless on the same day. Through the analysis of digital data, electronic

---

[1] See *court case number 3:26-mj-218.*

monitoring of location data for the **Subject Devices**, and physical surveillance of North Carolina addresses associated to SEKE, law enforcement identified that SEKE was residing at 7015 Skye Bridge, Apt 211, Charlotte, NC 28278 (hereinafter "Seke Residence").

12. On or about June 23, 2026, law enforcement served a search warrant at the Seke Residence. During the execution of the warrant, SEKE was present and arrested by law enforcement on her outstanding federal warrant. Furthermore, law enforcement located and seized pursuant to the state search warrant the **Subject Devices**. As detailed more fully below, SEKE used the **Subject Devices** to communicate with other drug traffickers and to facilitate her involvement in the drug trafficking conspiracy for which a grand jury indicted her during October 2025. Given that iPhones such as the **Subject Devices** retain data and information for extended times, I believe that text messages, photographs, videos, and other indicia of her criminal activity remain and will be found on the **Subject Devices**.

**B. Background into the Villalobos DTO Investigation**

13. Between January 2024 and March 2025, DEA and other federal agencies identified Ernesto Villalobos as a hub of a drug ring shipping cocaine, fentanyl, and methamphetamine from southern California to Dayton, Ohio, Charlotte, North Carolina, and other locales (hereinafter, "Villalobos DTO"). During that time, federal agents intercepted approximately ten (10) drug parcels that Villalobos shipped from California bound for locations throughout the United States. Investigators tied these shipments to Villalobos through, among other things: (1) a review of surveillance videos that captured him shipping the parcels from a Staples in Huntington Park, California; (2) witness statements identifying him as the shipper of the packages; and (3) location information for his cellular telephone (which is more fully described as "the Villalobos Phone" below), that placed it in the vicinity of the Staples around

the time of the drug shipments. Additionally, as detailed below, in or around April 2025, DEA agents arrested Villalobos on federal charges, and during his post-*Miranda* interview, he admitted that he had sent multiple drug packages to the eastern United States.

14. Specifically, one of these parcels was shipped by the Villalobos DTO on April 18, 2024, from the Huntington Park Staples.

**a.** The parcel listed the following recipient information: [redacted], 1606 Hawfield Road, Charlotte, NC 28214-9210. On or about April 19, 2024, law enforcement lawfully intercepted this parcel in the Charlotte, North Carolina, area, and searched it pursuant to a state search warrant. Upon examining the package, investigators discovered it contained 5,032.0 grams of cocaine, as later confirmed by the DEA North Central Laboratory (NCL) through laboratory analysis.

**b.** Through further investigation into [redacted], investigators learned that that she had died on or around March 14, 2020. As part of the investigation, I queried CLEAR[2] for individuals associated with 1606 Hawfield Road. Investigators learned that SEKE was associated with the address. Furthermore, investigators identified that SEKE was the registered agent for "Qichen International Trade Co Limited", a business registered in North Carolina. Investigators identified that the registered address for SEKE and "Qichen International Trade Co Limited" is 1606 Hawfield Road, Charlotte, NC.

---

[2] CLEAR is a law enforcement database that is used as a tool for investigators to identify persons/businesses and associated address information.

**C. Indictment and Arrest of Villalobos**

15. On March 25, 2025, Villalobos was indicted by a Grand Jury in the Southern District of Ohio for violations of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). On the same day, U.S. District Court Judge Thomas M. Rose issued an arrest warrant[3] for Villalobos.

16. On March 26, 2025, the Honorable Magistrate Judge Pedro V. Castillo of the United States District Court of the Central District of California issued a federal search warrant[4] for 1547 E. 62nd St, Los Angeles, CA 90001, Villalobos's home (herein referred to as the Villalobos Residence).

17. On April 2, 2025, investigators from the DEA Los Angeles Field Division (LAFD) and DEA Dayton Resident Office executed the federal search warrant at the Villalobos Residence. Investigators located and seized Villalobos's cellular telephone (hereinafter referred to as the "Villalobos Phone") during the search warrant at the Villalobos Residence.

**D. Analysis of the Villalobos Phone**

18. On April 15, 2025, investigators searched the contents of the Villalobos Phone pursuant to the federal search warrant[5] granted by the Honorable Margistrate Judge Pedro V. Castillo of the United States District Court of the Central District of California for the Villalobos Residence which included the ability to search electronic devices utilized by Villalobos (i.e. the Villalobos Phone).

---

[3] *See court case number 3:25-cr-27.*

[4] *See court case number 2:25- mj-1770.*

[5] *See court case number 2:25- mj-1770.*

19. During analysis and review of the Villalobos Phone, investigators located text message communications between Villalobos and SEKE. SEKE used three different telephones to communicate with Villalobos, namely: (980) 287-7437 (the "**Subject Device 1**") listed under the contact "Eesha Atl New" in the Villalobos Phone; (678) 951-5484 (the "**Subject Device 2**") listed under the contact "Eesha" in the Villalobos Phone; and (770) 417-6801 (hereinafter "Previous Subject Device") listed under the contact "Eesha 2" in the Villalobos Phone. As detailed below, Villalobos in an interview with law enforcement confirmed SEKE as the user of **Subject Device 1**, **Subject Device 2**, and Previous Subject Device. Law enforcement found Villalobos's statements credible as DEA was able to corroborate his information from other sources.

20. The conversations on the Villalobos Phone with SEKE at **Subject Device 1** and Previous Subject Device included, but were not limited to: discussions of illicit activity such as drug trafficking, the shipping of illegal drugs from Los Angeles to Charlotte, SEKE's travel plans from Charlotte to Los Angeles, and the transferring of illicit funds between SEKE and Villalobos. Investigators observed that the conversation with **Subject Device 1** spanned June 23, 2023, to September 17, 2023. Investigators observed that the conversation with Previous Subject Device spanned a time frame of November 1, 2023, to April 1, 2025 (the day prior to the search warrant on the Villalobos Residence).

21. Furthermore, investigators located a text message screenshot on the Villalobos Phone sent by Villalobos to SEKE who was using Previous Subject Device. This message depicted a screenshot photo of Villalobos's Cash App balance which he appeared to have screenshotted while simultaneously Facetiming SEKE. When viewing the screenshot, a photo of a black female can be observed in the top right corner of the screenshot. I compared the photo of

the black female with the North Carolina Driver's License photo of SEKE and confirmed the individual shown in the screenshot is SEKE.

**E. Investigative Information Pertaining to the Subject Devices**

22. Upon discovering the communications between the Villalobos Phone with the **Subject Devices** and the Previous Subject Device, investigators submitted an administrative subpoena to Verizon for subscriber and toll data. Verizon responded to the administrative subpoenas with the following information:

**a.** Subscriber data received for **Subject Device 1** for the time period of April 7, 2025, - May 7, 2025, was listed as a "CHARTERCOMM" device with no associated subscriber name. The account effective data was listed as June 2, 2023.

**b.** Subscriber data received for **Subject Device 2** for the time period of April 6, 2024, - May 6, 2024, listed the account holder as [redacted] Seke, with the subscriber listed as SEKE.

**c.** Subscriber data received for Previous Subject Device for the time period of March 1, 2025, - May 7, 2025, listed the account holder and subscriber listed as [redacted] Seke. Law enforcement suspects that [redacted] Seke is a relative of SEKE. The account effective data was listed as November 20, 2020.

23. Based on my training and experience, and the training and experience of others involved in this investigation, I know that drug traffickers frequently will not provide personally identifying information to their cell phone service provider to attempt to conceal their identities and thwart law enforcement detection. Specifically, I believe this to be the case for **Subject Devices.**

24. Using law enforcement applications, investigators conducted analysis of toll data received on the Villalobos Phone throughout this investigation to determine the call frequency between the Villalobos Phone and **Subject Devices** and Previous Subject Device. It should be noted that this data does not span the entire length of the investigation, and it is likely that Villalobos contacted the **Subject Devices** and Previous Subject Device more frequently then listed below. Investigators learned that the Villalobos Phone communicated with the **Subject Device 1** approximately 1,210 times between July 15, 2024, and August 23, 2024. Investigators learned that the Villalobos Phone communicated with Previous Subject Device approximately 391 times between September 18, 2023, and February 19, 2025. Investigators did not find any call data between the Villalobos Phone and **Subject Device 2**.

25. Based on my training and experience, and the training and experience of others involved in this investigation, I know that drug traffickers commonly have multiple cell phones to segregate their illicit trafficking activities and communications from their phone which is used to communicate with family and friends who are not involved in their illicit activities. Specifically, I believe that SEKE utilized **Subject Device 1** and the Previous Subject Device to communicate illicit activities with the Villalobos DTO. Furthermore, I believe that SEKE utilizes **Subject Device 2** to communicate with family and friends who are not involved in her illicit activities.

26. Investigators searched the peer-to-peer transaction app known as "Cash App" for subscribers using **Subject Device 1, Subject Device 2, and** Previous Subject Device. Investigators identified that **Subject Device 1** is associated to Cash App user "PCA" with the "Cash-Tag" $PinkCos. Investigators are aware that SEKE has another business named "Pink Cosmetics LLC" that is registered in Georgia. Additionally, investigators also observed text

messages in the Villalobos Phone with Previous Subject Device where SEKE directs Villalobos to ship a parcel suspected of containing illegal drugs to "Pink Cosmetics, 227 W. 4th St, Suite 214, Charlotte, NC 28202". Investigators believe that "$PinkCos" is an abbreviation for SEKE's business "Pink Cosmetics".

27. Additionally, investigators identified that **Subject Device 2** is associated to Cash App user "Eesha" with the "Cash-Tag" $eeshapink. I compared the account photo for the Cash App user "Eesha" with SEKE's drivers license photo and confirmed the photo was SEKE. Investigators observed text messages in the Villalobos Phone with Previous Subject Device where SEKE tells Villalobos her Cash App account is "$eeshapink" (the account associated to **Subject Device 2**). Moreover, while reviewing Villalobos's Cash App transactions, investigators observed that Villalobos received a payment of $2,250 from Cash App user "Eesha" (the account subscribed to **Subject Device 2**).

28. Lastly, investigators identified that Previous Subject Device is associated to Cash App user "Eesha Seke" with the "Cash-Tag" $ChocxBunny.

**F. Interview of Villalobos and SEKE's Role in the Villalobos DTO**

29. Investigators interviewed Villalobos while he was in custody. Investigators asked Villalobos about the conversations on the Villalobos Phone with **Subject Device 1** and Previous Subject Device. Villalobos stated that these messages were with a black female named "Eesha" who was a drug trafficking associate. Investigators showed Villalobos a photo of SEKE, and Villalobos positively identified SEKE as "Eesha". Villalobos stated that he was a source of supply (SOS) of illegal drugs for SEKE. Villalobos stated that SEKE flew to Los Angeles on numerous occasions to receive illegal drugs from Villalobos and others in the Los Angeles

region. Upon receiving these illegal drugs, Villalobos stated that either him or SEKE would then ship the illegal drugs back to the Charlotte region.

### G. Current Subscriber Information for the Subject Devices

30. On May 14, 2026, investigators again submitted administrative subpoenas to Verizon for current subscriber and toll data for the **Subject Devices** and Previous Subject Device. Verizon responded to the administrative subpoenas the same day with the following information:

**a.** Subscriber data received for **Subject Device 1** for the time period of April 13, 2026, - May 13, 2026, was listed as a "CHARTERCOMM" device with no associated subscriber name. The account effective data was listed as June 2, 2023. It should be noted that this is the same subscriber information previously received by Verizon for **Subject Device 1.**

**b.** Subscriber data received for **Subject Device 2** for the time period of April 6, 2024, - May 6, 2024, listed the account holder as [redacted] Seke, with the subscriber listed as SEKE. It should be noted that this is the same subscriber information previously received by Verizon for **Subject Device 2.**

**c.** Subscriber data received for Previous Subject Device for the time period of April 13, 2026, - May 13, 2026, was listed as a "COMCAST" device with no associated subscriber name. The account effective data was listed as August 8, 2025.

### H. Arrest of SEKE and Search of the Seke Residence

31. On May 28, 2026, this court authorized a federal search warrant[6] for GPS and historical location data pertaining to the **Subject Devices.** The search warrant was subsequently

---

[6] *See court case number 3:26-mj-218.*

served to Verizon Wireless on the same day. Through the analysis of digital evidence pertaining to this case, electronic monitoring of location data for the **Subject Devices**, and physical surveillance of North Carolina addresses associated to SEKE, law enforcement identified that SEKE was residing at the Seke Residence.

32. On or about June 22, 2026, North Carolina Superior Court Judge Justin N. Davis issued a North Carolina state search warrant for SEKE's residence located at 7015 Skye Bridge Way, Apt 211, Charlotte, NC (the "Seke Residence"). The court-authorized state search warrant authorized the search for and seizure of the **Subject Devices** inside of the Seke Residence.

33. On or about June 23, 2026, at or around approximately 7:00 a.m., investigators from the DEA Dayton Residence Office, DEA Charlotte District Office, Belmont Police Department (BPD), and Charlotte-Mecklenburg Police Department (CMPD) served the state search warrant at the Seke Residence. During the execution of the search warrant, SEKE was present at 7015 Skye Bridge Way inside of Apt 211 and subsequently detained by DEA agents.

34. Upon being detained, SEKE was informed that investigators were granted a North Carolina court-authorized search warrant for Seke Residence which authorized the seizure of the **Subject Devices**. Investigators asked SEKE about the location of the **Subject Devices**. SEKE stated that the **Subject Devices** were located on her bed and her windowsill. Investigators dialed cellular telephone numbers assigned to **Subject Device 1** and **Subject Device 2** to confirm that the two phones to be seized were the **Subject Devices**. **Subject Device 1** rang when investigators dialed its number. **Subject Device 2** rang when investigators dialed its number. Given this confirmation, the **Subject Devices** were seized by BPD Detective (Det.) Aaron Thompson and subsequently transferred to DEA SA's Cameron Basile and Connor Palmateer.

35. While inside of the residence, investigators observed a Ruger Security-9 handgun bearing Serial Number 38442772 in plain view on the kitchen counter. The handgun was seized as evidence by CMPD Det. Bryan Wiggins.

36. I asked SEKE if she has ever been arrested or had her Miranda Rights read to her, to which SEKE replied no. I informed SEKE that DEA agents had received a federal indictment and federal arrest warrant for her and that she was placed under arrest. I read SEKE her Miranda Rights while in the presence of SA Connor Palmateer. SEKE acknowledged her rights and declined to speak with investigators or answer any questions.

37. I then showed SEKE a copy of her federal indictment and federal arrest warrant. While reviewing the arrest warrant, SEKE observed her address listed as "1606 Hawfield Road, Charlotte, NC" and made an unprovoked statement stating "1606 Hawfield Road? That was my address a couple years ago when I first moved here".

38. At or around approximately 7:30 a.m., DEA agents transported SEKE to the Charles R. Jonas Federal Building, located at 401 W Trade Street, Charlotte, NC 28202, to be processed by the United States Marshal Service (USMS).

39. At or around approximately 12:00 p.m., SEKE appeared for her initial appearance in front of U.S. Magistrate Judge David C. Keesler of the Western District of North Carolina. During this hearing, SEKE waived her right to a detention hearing and identity hearing in the Western District of North Carolina. Judge Keesler ordered that SEKE be remanded to the custody of the USMS pending extradition to the Southern District of Ohio for additional judicial proceedings. SEKE was then transported to Gaston County Jail located at 425 Dr. Martin Luther King Jr. Way, Gastonia, NC 28052.

**I. Investigative Information Gained from SEKE's Jail Calls**

40. On or about June 24, 2026, investigators listened to jail calls made by SEKE. Investigators overheard the following statements:

a. During a call made on or about June 23, 2026, at 2:32 p.m., SEKE was speaking to an individual believed by law enforcement to be [redacted] Seke. During the call, SEKE was describing to the other person how to get into her apartment complex gate and apartment door. SEKE was stating what items she needed the individual to grab from the Seke Residence. SEKE made the statement "I got the money over there…I got cash at the house (Seke Residence)... Like I may need that for when I get to Ohio". Additionally, during a call made on or about June 23 at 7:48 p.m., SEKE was speaking to an individual believed by law enforcement to be [redacted] Seke. At the end of the call, SEKE made the statement "And if you do go back to the house (Seke Residence) there is more money in the stash I got somewhere, I just gotta tell you where". In later calls, SEKE proceeded to discuss money inside of a manilla envelope in the top drawer of her bedroom dresser.__Based on my training and experience, and the training and experience of those involved in this investigation, I believe that the money located in SEKE's apartment may be illicit profits derived from drug trafficking. I know that drug trafficking is a lucrative business which generates large amounts of money. Furthermore, through analysis of digital evidence contained in this case, as well as interviews conducted with cooperating defendants, I am aware that SEKE was paid in cash by Villalobos and other co-conspirators for her role in trafficking kilograms of cocaine from Los Angeles to regions of North Carolina.

b. During a call made on or about June 23, 2026, at 8:28 p.m., SEKE was speaking to an individual who she refers to as "London". During the call, "London" asked SEKE how law enforcement knew that SEKE was involved or connected. SEKE replied, "the Nigga

that I met years ago, years ago. And then the one I went to LA (Los Angeles) for and linked up with him". "London" replied, "And he threw you under the bus? How did he get your number? How did he get your address"? SEKE replied, "Well London…it's easy, they looked at that phone number…they had the old phone and the new phone (**Subject Devices**). That's how I knew he said something because those are the only two numbers (**Subject Devices**) that he had, he didn't have that other number, the big number. Like I don't even know. That's the thing…I have to see what they have in discovery. I really think they are fishing. Honestly, I think they are fishing…but the fact is they have a little something…they must have something"._Based on my training and experience, and the training and experience of those involved in this investigation, I believe that when SEKE states "the Nigga that I met years ago, years ago. And then the one I went to LA (Los Angeles) for and linked up with him", that SEKE is referring to both Villalobos and other co-conspirators involved in this case. Additionally, I believe that when SEKE states "That's how I knew he said something because those are the only two numbers that he had", that SEKE is stating that Villalobos was only aware of SEKE using those two numbers, the **Subject Devices**, and that law enforcement learned of those numbers from Villalobos during the investigation. Furthermore, I believe that when SEKE states "I have to see what they have in discovery. I really think they are fishing. Honestly, I think they are fishing…but the fact is they have a little something…they must have something", that SEKE is stating that law enforcement was "fishing for answers" by attempting to question her post-arrest, but that the DEA must have some type of evidence on her since an indictment and arrest warrant for SEKE were obtained.

c. During a call made on or about June 23, 2026, at 8:39 p.m., SEKE was speaking to an individual believed by law enforcement to be [redacted] Seke. Unknown individuals were also present in the background during the call. During the call, SEKE stated "The person

whose name is on the indictment is the name I recognize and those are the only two numbers (**Subject Devices**) he had". SEKE was asked by the individuals what the name was, and she replied "Tony". SEKE was asked by the individuals what "Tony's" last name was, and SEKE replied "Villalobos". SEKE then stated that "Tony's" first name began with an "E" but she could not remember the name. SEKE then referenced that she "saw Villalobos's first name that one time when she looked up 'what happened' ". SEKE then told the individuals to "Put in Ohio. Put in "Villalobos" or something, and you might find that information". The individual asked SEKE "Was it Dayton, Ohio?", and SEKE replied "Yes, Dayton, Ohio". SEKE then stated "Remember when I read everything out?", and the individuals replied "Yes. Remember what date and year?...2025?...2024? What'chu think?". SEKE replied "Yes, it was last year (2025) when it happened".__Based on my training and experience, and the training and experience of those involved in this investigation, I believe SEKE is stating that law enforcement became aware of the cellular telephone numbers for the **Subject Devices** due to law enforcement's investigation into Villalobos. Additionally, I believe SEKE is stating that Villalobos was only aware of two numbers for SEKE, the **Subject Devices**, and that he offered information pertaining to those two numbers to law enforcement. Furthermore, throughout this investigation, I have become aware that SEKE refers to Villalobos as "Tony". I believe that when SEKE is stating she previously looked up information about "Tony" and "Villalobos", that she is stating she looked up articles on the internet through google and other open-source search engines regarding the arrest of Villalobos in April 2025.

41. The **Subject Devices** are currently in the lawful possession of the DEA. They came into the DEA's possession in the following way: seized by law enforcement officials on June 23, 2026, during the execution of a court authorized state search warrant at 7015 Skye

Bridge Way, Apt 211, Charlotte, NC, a location identified by investigators to be SEKE's residence. Therefore, while the DEA might already have all necessary authorities to examine the **Subject Devices**, I seek this additional warrant out of an abundance of caution to be certain that an examination of the **Subject Devices** will comply with the Fourth Amendment and other applicable laws.

42. The **Subject Devices** are currently being securely stored at the Ohio Narcotics Intelligence Center located at 50 E. Business Way, Cincinnati, OH 45241 in preparation for data preservation and forensic analysis upon the court authorizing the search of the **Subject Devices**. In my training and experience, I know that the **Subject Devices** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Subject Devices** first came into the possession of the DEA.

## BACKGROUND OF DRUG TRAFFICKERS

43. Based on my prior training and experience, I know it is common for drug traffickers to maintain a variety of electronic devices to further their illicit activities, to include cellular telephones, mobile telephones, lap top computers, paging devices, answering machines, police scanners and money counters. These said items are commonly stored and maintained in locations where drug traffickers commonly believe they can maintain control over and enjoy frequent and ready access to the devices, i.e., their homes, apartments, businesses, and motor vehicles. It is also common for drug traffickers to maintain multiple communication devices in order to communicate with drug suppliers and customers. It is also common for drug traffickers to engage in communication with drug customers and suppliers via email, text messaging, and through third-party messaging applications.

44. Persons engaged in drug trafficking often take or cause to be taken photographs and/or videotapes of themselves, associates, drug proceeds, firearms, or property derived from the proceeds derived from the sale of controlled substances. Traffickers commonly will maintain these photos in their possession and stored on their cellular phones.

## TECHNICAL TERMS

45. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be

retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

46. Based on my training, experience, and research, I believe that the **Subject Devices** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

47. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

48. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each of the **Subject Devices** were used, the purpose of the use, who used each **Subject Device**, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device in furtherance of drug trafficking activities, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

49. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Subject Devices** to human inspection in order to determine whether it is evidence described by the warrant.

50. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

51. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Subject Devices** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Cameron D. Basile

CAMERON D. BASILE
Special Agent
Drug Enforcement Administration

Subscribed and sworn to in accordance with the requirements of Crim. R. P. 4.1 via telephone on this 1st day of ~~June~~ July, 2026.

UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

ATTACHMENT A-1

The property to be searched is described as follows: a white Apple iPhone with clear and purple case and no visible IMEI (herein referred to as "**Subject Device 1**"). The **Subject Device 1** was seized by law enforcement officials on June 23, 2026, during the execution of a court authorized state search warrant at 7015 Skye Bridge Way, Apt 211, Charlotte, NC. The **Subject Device 1** is currently located at the Ohio Narcotics Intelligence Center located at 50 E. Business Way, Cincinnati, OH.

Pictures of **Subject Device 1** are listed below:





This warrant authorizes the forensic examination of the **Subject Device 1** for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-2

The property to be searched is described as follows: a whitish pink Apple iPhone with clear and black case and no visible IMEI (herein referred to as "**Subject Device 2**"). The **Subject Device 2** was seized by law enforcement officials on June 23, 2026 during the execution of a court authorized state search warrant at 7015 Skye Bridge Way, Apt 211, Charlotte, NC. The **Subject Device 2** is currently located at the Ohio Narcotics Intelligence Center located at 50 E. Business Way, Cincinnati, OH.

Pictures of **Subject Device 2** are listed below:



This warrant authorizes the forensic examination of the **Subject Device 2** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the **Subject Devices** described in Attachments A-1 through A-2 that relate to violations of Title 21 U.S.C. § 841; Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21 U.S.C. § 846; and Use of a Communication Facility to Commit a Felony, in violation of Title 21 U.S.C. § 843(b) and involve **Tyisha SEKE** since January 2021 to the present, including:

a. any communications, including but not limited to phone calls, text messages, application messages, relating to sources of and possession of controlled substances.

b. any information related to sources of firearms or controlled substances (including names, addresses, phone numbers, or any other identifying information).

c. any internet search history and browser files related to sources and possession of controlled substances.

d. types and amounts of controlled substances possessed as well as dates, places, and amounts of specific transactions.

e. any information, including GPS location information, recording SEKE or other individuals schedule or travel in connection to trafficking in controlled substances.

f. any photographs and videos, including metadata, and any other records, relating to source or possession of controlled substances; and

g. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the **Subject Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Evidence as to who and when the various logs, phonebooks, saved usernames and passwords, documents, and browsing history were created.

4. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

5. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver to the custody of U.S. Government attorneys (and their assigned support staff) a complete copy of all seized or copied stored electronic data for their independent review.